### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

```
------------------------------- x
JAMES A. HARNAGE,                :
                                 :
          Plaintiff,             :    Civil No. 3:17-cv-356(AWT)
                                 :
          v.                     :
                                 :
SREELAKSHMII REDDIVARI, JOANNE   :
ERNEST, JACQUELINE ANDERSON, and :
JOAN LEBLANC,                    :
                                 :
          Defendants.            :
------------------------------- x
```

### RULING ON MOTION FOR SUMMARY JUDGMENT

The plaintiff, James A. Harnage, who is incarcerated within Connecticut's Department of Correction, brings this civil rights action pro se pursuant to 28 U.S.C. § 1983. The remaining named defendants are Sreelakshmi Reddivari, Joanne Ernest, Jacqueline Anderson, and Joan LeBlanc.[1] The remaining claim is an Eighth Amendment claim for deliberate indifference to serious medical needs relating to post-operative care the plaintiff received in the prison medical wing (the "Med-Surg 5 Prison Wing") of the University of Connecticut Health Center ("UConn").

The defendants have filed a motion for summary judgment. The plaintiff has filed a partial opposition, conceding that Ernest should not remain in this action because she has been

---

[1]The court dismissed the claims against all other defendants in the Initial Review Order directed to the claims in the original complaint. See ECF No. 11.

misidentified.[2] See Pl.'s Mem. in Opp'n to Mot. for Summ. J. ("Opp'n") 1, ECF No. 157-2. Accordingly, the motion is being granted as to Ernest. For the reasons that follow, the motion is also being granted as to Anderson and LeBlanc. The defendants' motion is being denied as to Reddivari.

## I. FACTS

The plaintiff was incarcerated at the MacDougall-Walker Correctional Institution ("MacDougall") within the Connecticut Department of Correction at all times relevant to this action.

On September 2, 2015, the plaintiff was transferred from MacDougall to UConn and underwent hernia surgery.[3] On September 4, 2015, he was transferred to the Med-Surg 5 Prison Wing for post-operative care. He remained there until he was discharged from UConn and returned to MacDougall on September 8, 2015.

---

[2] Because the sworn declaration of Ernest demonstrates that she never worked in the Med-Surg 5 Prison Wing, see Def.'s Ex. A: Decl. of Joanne Ernest ¶ 3, ECF No. 143-2, and because the plaintiff acknowledges that "[t]he defendants have provided sufficient information upon which Harnage believes that Joanne Ernest was misidentified as a defendant in this action and should not be named herein," Pl.'s Local Rule 56(a)2 Statement ("Pl.'s Statement") 19, ECF No. 157-1, the court finds that there is no genuine issue of material fact as to whether she mistreated the plaintiff during his stay in the Med-Surg 5 Prison Wing. She did not.

[3] The surgery itself is not at issue in the instant litigation. See Defs.' Ex. G: Tr. from Dep. of Pl. ("Dep. Tr.") 33:10-13, ECF No. 143-8 (The complaint "only involves a time period where I was at med-surgical 5 on the prison ward."); see also id. at 39:6-23.

On February 28, 2017, the plaintiff initiated the instant action, alleging, <u>inter alia</u>, that Reddivari, Jane Doe Medical Staff Member 5, Jane Doe Medical Staff Member 6, and Jane Doe Medical Staff Member 7 were deliberately indifferent to his medical needs during his post-operative stay at UConn. <u>See</u> Compl., ECF No. 1. On August 15, 2018, the plaintiff filed a Motion for Extension of Time to Identify the Doe Defendants <u>Nunc Pro Tunc</u> (ECF No. 17), which the court granted. <u>See</u> 8/16/2018 Order, ECF No. 20. After reviewing his medical records, the plaintiff filed a Corrected Complaint in which he identified the three Jane Doe defendants as Joanne Ernest, Joan LeBlanc, and Jacqueline Anderson. <u>See</u> Corrected Compl., ECF No. 25; <u>see also</u> Dep. Tr. 47:22-48:1, 55:1-5. LeBlanc and Anderson worked as registered nurses in the Med-Surg 5 Prison Wing and Reddivari worked as a physician assistant at all times relevant to the Corrected Complaint. <u>See</u> Defs.' Ex. B: Decl. of Jacqueline Anderson {"Defs.' Ex. B") ¶ 2, ECF No. 143-3; Defs.' Ex. C: Decl. of Joan LeBlanc ("Defs.' Ex. C") ¶ 2, ECF No. 143-4; Defs.' Ex. E: Discovery Produced by Pl. ("Defs.' Ex. E") 404, ECF No. 144.

The plaintiff claims that Anderson and LeBlanc deliberately ignored his medical needs during his post-operative stay in the Med-Surg 5 Prison Wing by delaying his pain assessments, denying him prescribed pain medication, and turning off, silencing, or otherwise ignoring his medical call button. <u>See, e.g.</u>, Corrected

Compl. ¶¶ 9, 10, 14, 16-20, 22-23; Dep. Tr. 41:13-17, 44:7-16, 50:18-51:2; Opp'n 11. The plaintiff affirmed in an affidavit that on September 5, 2015 he "attempted to address the inconsistency and lack of adherence with the doctor's orders . . . and Anderson responded that "doctors say one thing[,] but up here we do it our way." Pl.'s Ex. 1: Affidavit of James A. Harnage ("Pl.'s Ex. 1") ¶ 89, ECF No. 158. He also attested to his belief that Anderson falsified entries in his medical records in an effort to expedite his discharge from the Med-Surg 5 Prison Wing by making it appear as if he received more pain medication and reported less pain than he did. See id. at ¶¶ 85-97.

The plaintiff testified under oath at his deposition that Anderson engaged in this conduct for the duration of his stay in the Med-Surg 5 Prison Wing. See id. at 39:21-42:5. The plaintiff alleges in the Corrected Complaint that LeBlanc only engaged in the alleged conduct "the day before [his] last day at UConn," Corrected Compl. ¶ 23, and testified that his last day at UConn was September 8, 2015. Dep. Tr. 34:15-17.[4] The plaintiff's medical records reflect that Anderson provided him care on September 5-7, 2015, see Pl.'s Ex. 12: Cumulative Documentation Report ("Pl.'s Ex. 12") 40-72, ECF No. 158-11, and that LeBlanc provided him care

---

[4] During his deposition, the plaintiff reiterated that LeBlanc engaged in the alleged conduct on "maybe one day or [during] one shift." Id. at 79:25-80:1.

on September 5-6, 2015. See Pl.'s Ex. 11: Discharge Medication Administration Record ("Pl.'s Ex. 11") 3-5, ECF No. 158-10.

The plaintiff testified that the nurse he believed to be Anderson was a "five-five, five-seven, brunette, white female" who "wasn't heavyset," Dep. Tr. 74:19-25, and was "somewhere in her 30s." Id. at 77:7. He testified that the nurse he believed to be LeBlanc was a "[l]ittle bit more heavyset, older," and "shorter than Ms. Anderson" with "[a] little gray in her hair." Id. at 80:3-6. He estimated that "LeBlanc was probably ten years older than [Anderson and Ernest]." Id. at 80:25-81:1. Throughout his testimony, however, he indicated that, while his descriptions of Anderson and LeBlanc were based on his "recollection," id. at 79:22, 81:9-21, 82:22-25, he was "speculating" as to their appearance, id. at 74:22-23, 75:11-27, 77:15-20, and "may have confused Ernest and LeBlanc." Id. at 82:17-21; see also id. at 81:9-21. In his opposition, he states that he "likely confused the physical appearance of Anderson . . . with that of the many other nurses who provided the plaintiff with medical care." Opp'n 8.

In her sworn declaration, Anderson attested that she is "a black woman of Afro-Caribbean and Jamaican descent," Defs.' Ex. B ¶ 4, and that she "did not ignore plaintiff's medical needs or medical care during the shifts that [she] worked at [UConn] during September 2015." Id. at ¶ 7. In her sworn declaration, LeBlanc stated that, during the relevant period, she was "65 years old"

-5-

and "approximately five feet three and three quarter inches tall." Defs.' Ex. C ¶¶ 11-12. She also affirmed that she "did not provide plaintiff any medical care or treatment on September 7, 2015 because [she] did not work at UConn on that date." Id. at ¶ 9.

With respect to Reddivari, the plaintiff alleges that she, in a separate and unrelated incident[5], handled his surgical site so roughly during the course of her post-operative examination of the plaintiff that it caused him intense pain and amounted to cruel and unusual punishment under the Eighth Amendment. Corrected Compl. ¶¶ 24-41; see also Dep. Tr. 62:6-73:18. He testified that Reddivari intentionally and maliciously used excessive force when handling his wound site, despite an earlier admonition from him that she was being heavy-handed in her examination. See id. at 63:4-69:25; 71:2-73:18.

The plaintiff contends that he filed several documents at MacDougall in an attempt to exhaust his administrative remedies as to the claims at issue in the instant litigation. With respect to Anderson and LeBlanc, the record reflects that the plaintiff completed a Health Services Review request detailing alleged misconduct by several UConn nurses that was dated September 24,

---

[5] See Pl.'s Statement 11 ("It is undisputed that plaintiff confirmed at his deposition that the allegations and claims against the three nurses have absolutely nothing to do with the allegations and claims against Reddivari and that the complaint confirms this." (internal citations omitted)).

2015. <u>See</u> Pl's Ex. 6 at 3, ECF No. 158-5. The plaintiff testified at his deposition that he filed an appeal with respect to this review request form but did not receive copies of or responses to either form. <u>See</u> Dep. Tr. 112:18-113:19. With respect to Reddivari, the plaintiff maintains that he "properly and fully exhausted [his] administrative remedies[,]" Pl.'s Ex. 1 at ¶ 40, but acknowledged at his deposition that he was unsure of whether he filed a Health Services Review request that explicitly referenced her alleged misconduct:

> Q: You're not claiming that there was any other HSR you
> filed about the conduct at issue in this lawsuit[,]
> right?
>
> A: The conduct relating to these defendants?
>
> Q: Yes.
>
> A: No.
>
> Q: Okay. The - -
>
> A: Actually, I should review my records because there
> might be one I wrote specifically about Reddivari. I
> don't know that. When I was going through [my records],
> I may have been thinking abut Ernest, LeBlanc, and
> Anderson.
>
> Q: Okay.
>
> A: I have to rereview the records to check.
>
> Q: Okay. If you have one, please send that to me.
>
> A: I'm going to do that.

<u>Id.</u> at 115:2-16. To date, the plaintiff has not produced a Health Services Review request concerning Reddivari or her alleged

misconduct. But he has produced four Inmate Request Forms and one Inmate Administrative Remedy Form that he submitted, and which were responded to by correctional staff, that indicate that there may have been delays and/or failures in the processing, copying, and/or answering of his Health Services Review requests.

## II.   LEGAL STANDARD

A motion for summary judgment may be granted only where there are no issues of material fact in dispute and the moving party is therefore entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994). When ruling on a motion for summary judgment, the court may not try issues of fact, but must leave those issues to the jury. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987). Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. An issue is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477

U.S. at 248. A material fact is one that would "affect the outcome of the suit under the governing law." Id.

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Delaware & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)). However, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment. Stern v. Tr. of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 2007) (quoting W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990)). The "mere existence of a scintilla of evidence in support of the [nonmovant's] position" is also insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant. Anderson, 477 U.S. at 252.

The nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists. See Celotex Corp., 477 U.S. at 324. "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," Weinstock, 224 F.3d at 41, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, who must "demonstrate more

-9-

than some metaphysical doubt as to the material facts, . . . [and] must come forward with specific facts showing that there is a genuine issue for trial." Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993) (quotation marks, citations and emphasis omitted). He cannot "'rely on conclusory allegations or unsubstantiated speculation' but 'must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact.'" Robinson v. Concentra Health Servs., 781 F.3d 42, 34 (2d Cir. 2015) (citation omitted). If the nonmovant fails to meet this burden, summary judgment should be granted.

The court reads a pro se party's papers liberally and interprets them "to raise the strongest arguments that they suggest." Willey v. Kirkpatrick, 801 F.3d 51, 62 (2d Cir. 2015) (internal quotation marks and citation omitted). Despite this liberal interpretation, however, allegations unsupported by admissible evidence "do not create a material issue of fact" and cannot overcome a properly supported motion for summary judgment. Weinstock, 224 F.3d at 41.

## III.   DISCUSSION

LeBlanc and Anderson argue that they are entitled to summary judgment on the plaintiff's Eighth Amendment claim because the plaintiff misidentified them as defendants in this action and failed to properly exhaust his administrative remedies as to them. They also argue that they are shielded from liability by the

-10-

doctrine of qualified immunity. The court agrees with the first argument and therefore grants summary judgment as to both defendants without reaching the other two grounds.

With respect to LeBlanc, the court concludes that the plaintiff has failed to create a genuine issue of material fact as to whether she was deliberately indifferent to his medical needs. LeBlanc attested in her sworn declaration that she did not work in the Med-Surg Prison Wing on September 7, 2015, the only day the plaintiff alleges that she engaged in the complained-of misconduct. See Defs.' Ex. C ¶ 9; see also Corrected Compl. ¶ 23. Medical records corroborate that LeBlanc did not provide care to the plaintiff on that date. See, e.g., Pl.'s Ex. 11 at 3-5; Pl.'s Ex. 12 at 60-72. The plaintiff himself "does not dispute that LeBlanc did not work on September 7, 2015, the day before Harnage discharged from UConn." Pl.'s Statement 8. Therefore, summary judgment should be granted in favor of LeBlanc.[6]

---

[6] In an effort to save his claim against LeBlanc, the plaintiff asserts that he "mistakenly identified LeBlanc as Ernest, and vice versa," Pl.'s Statement 19, and argues that he should be allowed to substitute LeBlanc for Ernest with respect to the allegations in the Corrected Complaint. See Opp'n 9. The court has already rejected the plaintiff's attempt to do so in a ruling denying his Motion for Leave to Amend and File Second Corrected Complaint:

> After the completion of discovery and the filing by the defendants of their motion for summary judgment, the plaintiff seeks to amend his complaint to change the lawsuit against defendant Joan LeBlanc. The plaintiff identified the Doe defendants after reviewing medical records. As explained by the defendants in detail in

The court likewise concludes that the plaintiff has failed to create a genuine issue of material fact as to whether Anderson was deliberately indifferent to his medical needs. In her sworn declaration, Anderson affirmed that she is a Black woman, see Def.'s Ex. B ¶ 4, a fact the plaintiff does not dispute. See Pl.'s Statement 7. The plaintiff states that he "may well have misperceived Anderson's skin tone, whether light or dark, or misperceived which nurse was required to provide the treatment that was due to be administered." Id. He admits that he "likely confused the physical appearance of Anderson . . . with that of the many other nurses who provided the plaintiff with medical care." Opp'n 8. There is no genuine issue as to the fact that the nurse the plaintiff states he is quoting as saying " . . . up here we do it our way" is not Anderson.

But the plaintiff nonetheless maintains that he did not misidentify Anderson:

> Plaintiff disputes that he failed to inform counsel for defendants that he was skeptical of his ability to recall a physical description of who was who, and which nurse specifically was supposed to be treating plaintiff and failed in this duty. Plaintiff was merely attempting to

their opposition (ECF No. 166), the plaintiff's motion is untimely and granting the plaintiff's motion would result in unfair prejudice to the defendants. Moreover, the plaintiff fails to provide a satisfactory explanation for the delay. See Cresswell v. Sullivan & Cromwell, 922 F.2d 60, 72 (2d Cir. 1990).

5/13/2020 Order, ECF No. 167.

make his best guess as to who was whom in relation to
entries consistent with his medical records.
. . .
Plaintiff strongly disputes that Anderson is
'misidentified' in this action! However, her physical
description may have been flawed[.]
. . .
The plaintiff disputes that his ability to recall the
physical appearance of persons whom he had little
contact with, while he was heavily sedated and suffering
high fevers and other signs of infection, more than
[four] full years after an event, is a reliable means to
identify an individual, over and above the computer
entry and hard copy medical records which identify that
person.

Pl.'s Statement 7, 20.

However, the medical records do not support a conclusion that

Anderson was deliberately indifferent to the plaintiff's medical

needs.

[N]ot every lapse in medical care is a constitutional
wrong. Rather, a prison official violates the Eighth
Amendment only when two requirements are met. . . .

The first requirement is objective: the alleged
deprivation of adequate medical care must be
sufficiently serious. . . .

The second requirement for an Eighth Amendment violation
is subjective: the charged official must act with a
sufficiently culpable state of mind. . . . [I]t suffices
if the plaintiff proves that the official acted with
deliberate indifference to inmate health. Deliberate
indifference is a mental state equivalent to subjective
recklessness. . . . This mental state requires that the
charged official act or fail to act while actually aware
of a substantial risk that serious inmate harm will
result. . . .

The charged official must be subjectively aware that his
conduct creates such a risk.

-13-

Salahuddin v. Goord, 467 F.3d 263, 279-80 (2d Cir. 2006) (internal quotations and citations omitted). A review of the medical records demonstrates that the plaintiff has failed to create a genuine issue of material fact with respect to either the requirement that the deprivation of medical care by Anderson must be sufficiently serious, or the requirement that Anderson acted with a sufficiently culpable state of mind.

The plaintiff claims that Anderson was deliberately indifferent to his medical needs on three separate occasions by failing to administer his prescribed care:

> Plaintiff was scheduled to receive pain medication every one (1) hour, as needed. Plaintiff was prescribed . . . pain management assessments for monitoring the hourly need to relieve breakthrough pain. Anderson . . . ignored plaintiff's prescribed doctor's orders on, at a minimum, September 5, 2015, for at least 4 ½ hours, and on September 6, 2015, for 9 hours and 39 minutes. Anderson . . . left Harnage to suffer on September 7, 2015, for yet another 8 hours and 10 minutes, and never even bothered to return.

Opp'n 10-11 (internal citations omitted). Contrary to the plaintiff's contentions, however, the medical records show that his pain levels were ordered to be assessed "daily," Pl.'s Ex. 9: Care Plan Revision History 8, ECF No. 158-8, and that the type and frequency of the pain medication he received would be determined by his assessed pain levels. See Pl.'s Ex. 11 at 7-8. Depending on his assessed pain level, the plaintiff was to be administered hydromorphone HCL (in dosage amounts of 0.4 to one milligram) every

one hour as needed or oxycodone (in dosage amounts of five to ten milligrams) every four hours as needed. <u>See</u> <u>id.</u> The medical records also show that the nursing care the plaintiff received from Anderson and other nurses was entirely consistent with the prescribed nursing care.

The Cumulative Documentation Report shows that the plaintiff's pain level was evaluated 11 times on September 5, 2015, six times by Anderson and five times by other nurses. Anderson evaluated the plaintiff's pain level six times between 8:10 a.m. and 5:53 p.m. (8:10 a.m., 12:42 p.m., 1:51 p.m., 4:05 p.m., 5:10 p.m. and 5:53 p.m.). The plaintiff assessed his pain level as "acceptable" at 8:10 a.m., 1:51 p.m., and 5:53 p.m. He assessed it as "unacceptable" at 12:41 p.m. and pain medication (ten milligrams of oxycodone) was administered. He assessed it as "unacceptable" at 4:05 p.m. and pain medication was not administered because it was within four hours of the previous administration. The plaintiff assessed it as "unacceptable" at 5:10 p.m. and pain medication (ten milligrams of oxycodone) was administered. The pattern with respect to Anderson is the same as the pattern with respect to other nurses who evaluated the plaintiff's pain level. On the five occasions when his pain level was evaluated by other nurses, the plaintiff had assessed his pain as "acceptable" on three occasions and "unacceptable" on two occasions. On both occasions when he

-15-

assessed his pain as "unacceptable" pain medication (one milligram of hydromorphone) was administered.

The Cumulative Documentation Report shows that the plaintiff's pain level was evaluated seven times on September 6, 2015, three times by Anderson and four times by other nurses. Anderson evaluated the plaintiff's pain level at 8:20 a.m., 5:59 p.m. and 7:06 p.m. The plaintiff assessed his pain level as "acceptable" at 8:20 a.m. and 7:06 p.m. Pain medication (ten milligrams of oxycodone) was administered to the plaintiff at 11:33 a.m., although no corresponding pain assessment entry was logged in the Cumulative Documentation Report. The plaintiff assessed his pain level as "unacceptable" at 5:59 p.m. and pain medication (ten milligrams of oxycodone) was administered. On the four occasions when his pain level was evaluated by other nurses, the plaintiff had assessed his pain as "acceptable" on three occasions and "unacceptable" on one occasion, at which time pain medication (ten milligrams of oxycodone) was administered.

On September 7, 2015, the plaintiff's pain level was evaluated ten times, three times by Anderson and seven times by other nurses. Anderson evaluated the plaintiff's pain level at 8:10 a.m., 10:47 a.m., and 11:50 a.m. The plaintiff assessed his pain level as "acceptable" at 8:10 a.m. and 11:50 a.m. He assessed it as "unacceptable" at 10:47 a.m. and pain medication (ten milligrams of oxycodone) was administered. On the seven occasions when his

-16-

pain level was evaluated by other nurses, the plaintiff assessed his pain as "acceptable" on three occasions and "unacceptable" on four occasions. On the four occasions when he assessed his pain as "unacceptable" pain medication (ten milligrams of oxycodone) was administered.

The plaintiff also claims that Anderson falsified the entries in his medical records by "frequently report[ing] plaintiff's pain score less than Harnage recalls reporting," Pl.'s Statement 17, and by indicating in her notes that "he received pain meds as ordered." Id. at 18 (quoting Pl.'s Ex. 12 at 51). But Anderson's entries are entirely consistent with the entries of nurses who worked other shifts and evaluated his pain. Moreover, the plaintiff has taken the position that no weight should be placed on his inability to give an accurate physical description of Anderson because the medical records are a more reliable method for identifying her, and he was heavily sedated and suffering high fevers at the time of the events at issue and was asked to identify her more than four years later. The plaintiff fails to provide any explanation why his purported recall of pain scores he reported is any better than his recall with respect to the physical description of the nurse in question. Thus, he has not produced evidence that shows this assertion is more than mere speculation.

With respect to defendant Reddivari, the defendants argue that she is entitled to summary judgment on the ground that the plaintiff failed to exhaust administrative remedies as to her.

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), provides in relevant part that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies are available are exhausted." In enacting § 1997e, Congress sought to afford prison officials time and opportunity to address complaints internally and reduce the quantity, and improve the quality, of prisoner suits. See Porter v. Nussle, 534 U.S. 516, 524-25 (2002). Exhaustion of administrative remedies is mandatory for any prisoner challenging the conditions of his confinement. See id. at 523.

In Woodford v. Ngo, 548 U.S. 81, 93 (2006), the United States Supreme Court held that exhaustion under the PLRA requires "proper exhaustion," meaning full compliance with administrative procedures and deadlines. See also Ruggiero v. Cty. of Orange, 467 F.3d 170, 176 (2d Cir. 2006). To properly exhaust a claim, a prisoner must comply with the prison grievance procedures, including utilizing each step of the administrative appeal process. See Snyder v. Whittier, 428 F. App'x 89, 91 (2d Cir. 2011) (citing Jones v. Bock, 549 U.S. 199, 218 (2007)). "'[T]he level of

-18-

detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim,' because 'it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.'" Espinal v. Goord, 554 F.3d 216, 223 (2d Cir. 2009) (quoting Jones, 549 U.S. at 218). "An 'untimely or otherwise procedurally defective administrative grievance' . . . does not constitute proper exhaustion." Snyder, 428 F. App'x at 91 (quoting Woodford, 548 U.S. at 83-84).

"An inmate may be excused from the exhaustion requirement only if administrative remedies were not in fact available." Shehan v. Erfe, No. 3:15-cv-1315 (MPS), 2017 WL 53691, *6 (D. Conn. Jan. 4, 2017) (citing Ross v. Blake, 136 S.Ct. 1850, 1858 (2016)). The Supreme Court has identified three circumstances in which an administrative remedy cannot be used by an inmate to obtain relief: (1) "the administrative remedy may operate as a 'dead end,' such as where the office to which inmates are directed to submit all grievances disclaims the ability to consider them . . . [(2)] the procedures may be so confusing that no ordinary prisoner could be expected to 'discern or navigate' the requirements ... [a]nd [(3)] prison officials may 'thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" Id. (quoting Ross, 136 S.Ct. at 1859-60).

The administrative remedies for the Connecticut Department of Correction pertaining to inmate health care issues are set

-19-

forth in Administrative Directive 8.9, entitled Administrative
Remedy for Health Services. Pursuant to the version of
Administrative Directive 8.9 that was in effect in September
2015, there are two types of Health Services Review:

> A. <u>Diagnosis and Treatment</u>. A review of a diagnosis or
> treatment including a decision to provide no
> treatment, relating to an individual inmate.
>
> B. <u>Review of an Administrative Issue</u>. A review of a
> practice, procedure, administrative provision or
> policy, or an allegation of improper conduct by a
> health services provider.

Defs.' Ex. H: CT Dep't of Corr. Admin. Directive 8.9 at ¶ 9, ECF
No. 143-9. An inmate seeking either type of review is first
required to attempt an informal resolution of his grievance prior
to filing for a Health Services Review. See <u>id.</u> at ¶ 10. "The
inmate must attempt to resolve the issue face to face with the
appropriate staff member or with a supervisor via written request
utilizing CN 9601 Inmate Request Form." <u>Id.</u> If the form is used,
the inmate "must clearly state the problem and action requested to
remedy the issue," and a response is required within 15 days of
its receipt. <u>Id.</u>

 If the complaint cannot be resolved informally, an inmate is
then required to apply for a Health Services Review by filling out
a CN 9602 Inmate Administrative Remedy Form. See <u>id.</u> at ¶¶ 11 &
12. For requests regarding an allegation of improper conduct by a
health services provider, as here, the inmate is required to check

the "All Other Health Care Issues" box on the form, to concisely explain what he believes to be wrong and how he has been affected, and to deposit the completed form in the Health Services Remedies/Review box. Id. at ¶ 12. Upon receipt, the Health Services Review Coordinator is required to evaluate, investigate, and decide upon the review request within 30 days and indicate the disposition of the request on the submitted form with one of the following: "Rejected, Denied, Compromised, Upheld or Withdrawn." Id. at ¶ 12A. The inmate may appeal the decision within 10 business days by completing a CN 8901 Appeal of Health Services Review form and depositing it in the Health Services Remedies/Review box. Upon receipt, the contracted health services provider is required to decide the appeal within 15 business days and promptly inform the inmate of the outcome. Id. at ¶ 12C. At that time, the inmate is deemed to have exhausted the Health Services Review process.

The plaintiff asserts that he exhausted the administrative remedies made available to him by the Connecticut Department of Correction or, in the alternative, was impeded in his attempts to do so by the medical staff. Specifically, he contends that "the medical staff at MacDougall actively interfered with and thwarted plaintiff's many exhaustion attempts by failing to log, process, and return [Health Services Reviews] and Inmate Request Forms," Opp'n 19, and that "[a]ny lack of documentation" of his exhaustion efforts "is the result of [the] medical staff's failure to properly

handle . . . [and] return these documents to the plaintiff with written responses." Pl.'s Statement 13. While "[i]t is undisputed that no [Health Services Review request] mentioning Reddivari or her alleged treatment of [the] plaintiff has even been produced in this case, either before, during or after the plaintiff's deposition," see Pl.'s Statement 12, several forms submitted by the plaintiff and responded to by correctional staff suggest that there may have been delays and/or failures in the processing, copying, and/or answering of the Health Services Review requests submitted by the plaintiff.

The record reflects that the plaintiff submitted four Inmate Request Forms and one Inmate Administrative Remedy Form to address Health Services Review requests regarding his September 2015 surgical care that he claims went unanswered. On October 29, 2015, the plaintiff submitted two of the four Inmate Request Forms. In the first form, addressed to Warden Chapdelaine, the plaintiff stated that he had filed "multiple Health Service Reviews recently to address issues involving my surgical procedure, medical care and medical staff conduct" and "ha[d] yet to receive a single response to any of them," Pl.'s Ex. 8 at 3, ECF No. 158-7. On October 30, 2015, he received the following response: "I have some replies going out to you in the mail today. Sorry for the wait." Id. In the second form, addressed to Health Services Administrator Rikel Lightner, the plaintiff again stated that he "ha[d] filed a

number of Health Service Reviews recently regarding issues
relevant to [his] surgical procedure . . . [including] issues
involving [his] medical condition, care or staff member conduct"
and had received no response. Id. at 6. On November 30, 2015, he
received a response stating: "The last remedy logged and answered
is 10/7/2015 # 7046 re: Name Badges. If there are UNRESOLVED
specific issues[,] please let this department know." Id. On
November 11, 2015, the plaintiff completed a third Inmate Request
Form stating that he "still [had] not received a written response
from any of [his] Health Service Reviews filed since [his]
surgery[.]" Id. at 5. He received a response stating that his
grievance was "[f]orwarded to [the] HSR Coordinator to get you
copies of responses. Sorry for the delay." Id. On July 7, 2016,
the plaintiff submitted a fourth Inmate Request Form stating, inter
alia, that he had "repeatedly written Health Service Reviews
without receiving responses" and that "[his] last written response
to a [Health Services Review] was received 5 full months after it
had been submitted." Id. at 8. He received a response stating that
his records "indicate that . . . [his] administrative remedies
have been responded to[.]" Id. Lastly, he submitted an Inmate
Administrative Remedy Form on July 7, 2016, which stated that
"[d]espite [his] numerous filings of [Health Services Reviews],
they are not being responded to by staff." Id. at 7. On September

-23-

7, 2016, he received a response stating that "we are addressing the delay in response to [Health Services Reviews]." Id.

The court concludes that there are genuine issues of material fact as to whether the plaintiff exhausted his administrative remedies as to Reddivari and whether he was impeded in his ability to do so by delays and/or failures in the facility's Health Services Review process.

## IV.   CONCLUSION

For the reasons set forth above, the Motion for Summary Judgment (ECF No. 143) is hereby GRANTED in part and DENIED in part. The motion is granted as to defendants Ernest, LeBlanc, and Anderson, and it is denied as to defendant Reddivari.

It is so ordered.

Dated this 16th day of September 2020, at Hartford, Connecticut.

_____

/s/ AWT

Alvin W. Thompson
United States District Judge
